### M. & J. TRACY v. DIRECTOR GENERAL OF RAILROADS.

### THE JOHNSTOWN.

(District Court, S. D. New York. December 29, 1922.)

Collision ⬡⇒74—Evidence held to show it was tow in charge of respondent's tug which struck moored barge.

    Evidence that libelants' barge, while moored to a pier, was struck by a car float in tow and damaged, with evidence that respondent's tug was in tow of a car float at the time and place, *held* sufficient to show that it was the tow of respondent's tug which caused the damage, though witnesses from the tug denied any collision.

In Admiralty. Libel by M. & J. Tracy against the Director General of Railroads. Decree rendered for libelants.

James A. Martin, of New York City, for libelants.
J. Harvey Turnure, of White Plains, N. Y., for respondent.

⬡⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

LEARNED HAND, District Judge. I think, on the balance of proof here, the libelants must win. The testimony of the libelants is not, taken by itself, of a very convincing character, and I do not think that I should have given a decree on it, except for the proof which was produced by the respondent himself and which fits in, as far as I can see, quite by chance with the stories, and compels me to conclude that on the whole the libelants have carried his burden.

Of the two libelants' witnesses, both appeared to me, so far as I could judge, to be credible, especially Colburn, whose story alone I must own is not very convincing. But his appearance somewhat allays the suspicion that the story naturally created. I do not really think it is necessary to rely on his testimony, and I have so much doubt about it that I am laying it aside from my conclusion. That doubt, as I say, arises from the improbability that he should have seen what he did just at that time. When I say probability, I mean only that. It is only fair to say that there is nothing impossible in his having been up at half past 4 in the morning. It was a stormy night, and he might have felt uneasy about his lines, and in saying that I disregard his testimony I do not mean to say that I do not believe him, but only that I do not think it is essential to a disposition of the case to count his testimony in.

The testimony of the bargee himself I cannot quite agree with Mr. Turnure in thinking open to challenge because of its improbability. I understand that both sides agree that the boat was struck by something on the early morning of March 1st. In any case, whether agreed or not, I have not the slightest question that the injury which was sued for here was occasioned at about that time that night by a collision between some boats in the stream, and this barge lying substantially where they say. When I say substantially, I do not mean that necessarily she was 14 tiers out, or 10 tiers out, but that she lay out beyond the extension of Pier M, and that something in the stream struck her a blow which caused these injuries. Now, then, we start with that, and we start with the statement that the bargee, coming up on deck, says he saw a car float and a tug which had it on a line. He also adds that it was a tug, whose shield he could see to be a keystone. I venture to question whether he ever did see the keystone under those circumstances. I do not think we have it in evidence here that at the moment it was raining, but it had been raining during that hour, and it may well have been raining just then. In any case, there was a high wind, and I think it doubtful whether he saw what he calls the emblem on the stack. Let me, for the sake of the argument, assume that he did not. The appearance of the boat made him think it was a Pennsylvania boat.

Now, we stop there. We have it in proof that at just that time the Pennsylvania tug Johnstown took the car float No. 34 from bridge 6 to midstream, turned her about, and took her off to the Manhattan shore. We have it in proof that no other tug of the Director General was in that vicinity at that time. I think it a fair inference, from the time and the weather and the proximity of these car bridges, that what

did the damage at that time was craft going in and out of the bridges. So I think the proof is exceptionally strong that it was the Johnstown which did it.

What is the evidence to the contrary? Unfortunately the master of the Johnstown is dead. There was a deck hand called, and he says they had no collision that morning, and I am quite willing to take his word. My belief is that the wind and tide, which was in the flood, had carried the float up and given a blow which, considering the weight of the float and the momentum thereof, would not have been observable, certainly to any one on the tug, and possibly not to any one on the float, although that would be unlikely. The deck hand does not say he was on the float. Of course, ordinarily the deck hand is there, and should be there; but we do not know whether there was any one on the float. That no one on the tug should have realized that there was this touching of the two, considering the night, the wind, and possibly the weather, seems to me eminently probable.

When I have to select the craft which did the damage unquestionably occasioned at the time, and when I find reliable evidence that it was a car float in charge of a tug, it really seems to me that we get proof which is about as near a demonstration as we can hope for under all the circumstances, and therefore, even though I did not take the testimony of the two witnesses that they recognized the emblem, and I am inclined to be very sceptical as to the truth of that testimony, I feel a degree of confidence in this case which I must say is not altogether common in admiralty cases.

There is a conflict of testimony, which perhaps I ought to mention, and that is as to the practice of taking out car floats on a line. A good many of the masters of the Pennsylvania Railroad say that they never did it. One, who was called to-day, and on the whole impressed me better than any of the other witnesses in the case, said that it was quite a common thing to do it. It seems to me an antecedent likelihood that, in cases where the slip is crowded, that must have been done; but I do not think it is essential that I should even assume that in this case the masters who testified for the respondent were not right. When it states in the log that the tug was turned in midstream, I do not suppose it means in the middle of the river; but it does not seem to me necessarily inconsistent with all that I find it necessary to accept of the libelant's story to suppose that, however the car float had been taken out, this thing happened during the maneuver of turning her in midstream, and so I do not think it is necessary for me to take sides between those who say that the tug is never taken out on a line and those who say that at times it is.

So far as I can permit myself to form a conclusion on that, I must say that I tend quite strongly to accept those who say that at times it is the practice, for I should think that it would be, when the slip was crowded, at times extremely convenient; but I do not feel it essential that I should commit myself on that issue. It does not seem to me that it is one which is crucial to the result.

Therefore I give the usual interlocutory decree.